Kevin ROWE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Nos. 2008–CA–000916–MR, 2008–CA–001824–MR.

Court of Appeals of Kentucky.

Nov. 18, 2011.

Stephen W. Owens, Pikeville, KY, Randall E. Reagan, Pro Hac Vice, Knoxville, TN, for appellant.

Jack Conway, Attorney General of Kentucky, Bryan D. Morrow, Assistant Attorney General, Frankfort, KY, for appellee.

Before CLAYTON, KELLER, and MOORE, Judges.

## OPINION

CLAYTON, Judge:

These consolidated appeals stem from the Pike Circuit Court's denial of Kevin Rowe's two separate Kentucky Rules of Criminal Procedure (RCr) 10.02 motions for a new trial following a judgment convicting him of murder and attempted murder. For the following reasons, we affirm.

## BACKGROUND

Following a nine-day jury trial, which began on November 3, 2005, Rowe was found guilty of both murder and attempted murder.. On May 4, 2006, the trial court sentenced him in accordance with the jury's recommendations of life in prison for murder and twenty years of imprisonment for attempted murder, which were to be served concurrently.

After Rowe's conviction, he engaged in extensive post-conviction challenges. Initially, Rowe directly appealed the conviction to the Kentucky Supreme Court, alleging four errors on the part of the trial court: (1) denying his motion to suppress evidence seized in the search of an out-

building located on property adjoining the property identified by street address in the search warrant; (2) refusing to allow jurors to read his prepared transcripts of the 911 call placed by Robin Hylton that interpreted inaudible portions of the call; (3) denying his motion for a continuance to allow his DNA expert time to review materials produced in the Commonwealth's expert's DNA analysis; and (4) denying his motions for mistrial prompted by the Commonwealth's alleged failure to disclose exculpatory evidence and to disclose a tape recording of his telephone conversation with his parents from jail.

On May 24, 2007, in a unanimous opinion, the Supreme Court affirmed his conviction. Therein, the Court succinctly set forth the facts of the case:

> Robin and Tammy Hylton, husband and wife, were shot while riding their four-wheeler on a road in a remote area in the Eastern Kentucky mountains. According to Robin, the assailant, who was riding an all-terrain vehicle (ATV), opened fire on them with an assault rifle. Although Robin reached for his own handgun to defend himself, Tammy accidentally knocked the gun from his hand in the melee. Robin fell wounded to the ground and remained motionless as if dead. The assailant walked up to Tammy, who was lying across the four-wheeler, and delivered a single shot into her body.
>
> After the assailant fled, Robin discovered that Tammy was dead. He called 911 on his cell phone and reported that he and his wife had been shot by a young man approximately twenty or twenty-one years old riding a Polaris ATV. While still on the phone, he exclaimed, "Oh, God, he's coming back." Robin tried to flee, but the assailant shot at him again several times and then began beating him on the head with a pistol. The two men wrestled. The assailant pressed the end of the gun barrel to the back of Robin's head and pulled the trigger. Fortunately, the gun was out of bullets. The assailant then fled on an ATV.

According to the police report, four persons who passed the scene shortly after the attacks saw the Hyltons and tried to help them. They were Ricky Rose, David Walker, Josh Anderson, and Pamela Perkins. According to his statement to police, Anderson retrieved Robin's pistol, removed the clip, cleared the chamber, and laid it back down.

Kentucky State Police (KSP) Trooper Jason Merlo was the first law enforcement official to arrive at the scene. According to Trooper Merlo's report, he found Tammy lying dead across the four-wheeler, Robin lying wounded on the ground, and Anderson standing near Robin. According to Trooper Merlo's trial testimony, Robin told Trooper Merlo that the assailant was a thin young man—whom Robin did not know—driving a red Kawasaki ATV (in contrast to the Polaris as Robin described in the 911 call) and that the assailant had stated, "Y'all killed my brother." Trooper Merlo also interviewed Rose, Walker, Anderson, and Perkins.

Trooper Derek Sturgill arrived next at the scene. He reportedly interviewed ten to fifteen people who were already at or had come to the scene on ATVs within an hour of Robin's 911 call. Apparently, none of these persons reported seeing anything of relevance. Although Trooper Sturgill gave the names and addresses of these interviewees to primary investigator Detective Stewart "Joey" Howard, Trooper Sturgill did not make a supplemental report with details concerning the content of these interviews. And the Common-

wealth provided no information concerning these interviewees to the defense in pretrial discovery.

While the investigation proceeded at the scene, according to the police report, William Younce reported that he passed Kevin Allen Rowe, who was traveling along a road down the side of the mountain leading away from the location of the scene of the crime. Younce recalled that Rowe wore a dark shirt and jeans and drove a red Kawasaki 700 ATV. He also noticed a dark box or duffle bag strapped to Rowe's ATV.

A short time later, according to the police report, Rowe appeared at the home of Phillip and A.J. Silcox offering to sell them firearms and a cell phone. Phillip Silcox testified that Rowe wanted to sell these items because Rowe wanted money to get out of town for a while. Phillip declined to buy the guns, but A.J. bought the cell phone. A.J. testified at trial that Rowe was wearing coveralls.

Rowe then appeared at the home of his girlfriend, Joanna Trump, according to her trial testimony. She testified that Rowe removed his coveralls at her house. She noticed that he had blood all over him and that his pants and underwear were soaked with blood. Trump gave him a change of clothes and patched up scratches and cuts over Rowe's arms and one of his legs. According to her, Rowe rinsed hair from a pistol at her house. Trump's mother also testified to seeing Rowe wash hair and blood from the pistol. Rowe told Joanna that he had been attacked by two men riding four-wheelers and that he had fought with them, during which time his gun fell out of his pants onto the ground. Rowe told her that one attacker pulled a knife on him and that Rowe had fired a shot, which grazed one attacker's legs.

The next day, Detective Howard interviewed Robin at the hospital. Robin described the assailant as a male, nineteen to twenty years old, tall, and slim, with short dark hair, and driving a red Kawasaki 700. Robin thought the attacker's assault rifle was fully automatic and described the pistol used by the attacker as dark with brown grips. Robin was confident he would be able to identify the shooter if he saw him again.

The detective returned to the crime scene. While there, several ATV riders drove by. Detective Howard advised them of Robin's description of the shooter and the shooter's ATV. One rider advised Detective Howard that he knew of a young man named Rowe who matched the description of the shooter and who often rode a red Kawasaki. According to the rider, Rowe lived on Harless Creek Road. Further investigation focused on Rowe, and Robin ultimately identified Rowe from a photo lineup.

KSP obtained an arrest warrant for Rowe and a search warrant for 390 Harless Creek Road, the house where Rowe lived with his father, Kenneth Rowe. The search warrant also explicitly authorized the search for and seizure of a red Kawasaki ATV, as well as any other vehicles used by Rowe. KSP seized several guns from the Rowes' residence, although none matched the descriptions of those used in the Hylton shooting. KSP also seized ammunition that matched the types of casings retrieved from the crime scene.

During the search, KSP found an ATV in a shed on adjoining property, known as 358 Harless Creek Road. The address for the adjoining location was different from the address of the location to be searched as described in the warrant. The different address was vi-

sibly posted on the road, according to Rowe. KSP seized the ATV and took it to the KSP post.

KSP performed various tests on the ATV, finding the presence of human blood on the left brake handle. DNA testing revealed that the blood was that of Robin Hylton. Blood was also found on other parts of the ATV; and although tests could not conclusively show that either Rowe or Robin were contributors, the DNA profile was consistent with the blood being a mixture of that from Robin and from Rowe.

Appellant was arrested and indicted for Tammy's murder and the attempted murder of Robin.

*Rowe v. Commonwealth*, 2007 WL 1532334 (Ky.2007) (2006–SC–000356–MR), *1–3.

Besides the other challenges in state court, which will be presented below, on July 11, 2007, Rowe filed a petition for habeas corpus relief in the United States District Court for the Eastern District of Kentucky, which raised four grounds for relief, including: (1) the denial of his suppression motion; (2) the refusal to allow jurors to review transcripts of his 911 call; (3) the withholding of exculpatory evidence; and (4) the violation of his constitutional right to cross-examine because the trial court had ruled that he was not entitled to certain lab notes and quality assurance data. The petition was denied on September 30, 2008.

During the pendency of the direct appeal, on March 29, 2007, Rowe filed a motion for a new trial. Rowe alleged that since the trial, he had the 911 tape enhanced by an expert who discovered new words on it. Then, on October 30, 2007, Rowe filed a supplemental motion for a

new trial, arguing that he had yet another enhanced version of the tape of the 911 call. The trial court, without an evidentiary hearing, denied Rowe's motion for a new trial on May 7, 2008. Rowe appealed this decision on May 13, 2008, and it is the subject of 2008–CA–000916–MR.

Next, on August 7, 2008, Rowe filed another motion for a new trial, alleging that a police officer kept the victim's clothes to ensure that evidence of her blood would be on Rowe's four-wheeler; that a new witness said he was with Rowe at the time of the crime; and that another investigator had reviewed the entire trial record, including the digitally enhanced copy of the 911 call,[1] and concluded that two shooters were involved. The trial court, again without an evidentiary hearing, denied this motion on September 4, 2008, holding that the action was already on appeal to the Court of Appeals and, therefore, the trial court did not have jurisdiction to rule on the second RCr 10.02 motion. On September 26, 2008, Rowe appealed this decision, which is the subject of 2008–CA–001824–MR.

Moving to the procedural history in our Court, Rowe filed a motion to consolidate 2008–CA–00916–MR with 2008–CA–001824–MR, which the court passed. Further, Rowe was ordered to show cause within thirty days as to why his second appeal (2008–CA–001824–MR) should not be dismissed because it lacked finality language as required in Kentucky Rules of Civil Procedure (CR) 56.04. Rowe motioned the trial court to alter, amend or vacate the September 4, 2008 order to include the requisite finality language.

In response to that motion, the trial court entered an order on December 17, 2008. In the order, the trial court said

---

1. Rowe claims that the digital technology to enhance the 911 tape was only available after   the trial.

that while it still believed that it did not have jurisdiction to rule on the August 7, 2008 motion since neither party had moved for a stay in the pending appeal, it also held that this second motion for a new trial was untimely under RCr 10.06(1) because it was filed outside the one-year time period for filing such a motion. And the trial court designated on the order that "[t]here being no just cause for delay, this is a final and appealable Order." On October 29, 2009, the Court of Appeals entered an order which held that 2008–CA–001824–MR was taken from a final and appealable order and consolidated the two appeals.

In the appeal 2008–CA–00916–MR, Rowe maintains that the trial court was arbitrary and capricious when it failed to hold an evidentiary hearing and enter findings of facts and conclusions of law after his motion for a new trial. The Commonwealth responds that the trial court properly exercised its discretion in denying Rowe's motion for a new trial. In the second appeal, 2008–CA–001824–MR, Rowe argues that the trial court erred in dismissing Rowe's second motion for a new trial on the basis of a lack of jurisdiction. The Commonwealth counters that not only did the trial court lack jurisdiction, but also the motion was not timely filed.

1. 2008–CA–00916–MR

■ Here, the basis of Rowe's argument for a new trial is that after the trial, he obtained a transcript of the 911 tape enhanced by an expert who discovered new words on it. In a later supplemental motion, Rowe maintained that he had another, even better, enhanced version of the 911 tape. The trial court denied the motions for a new trial because it determined that Rowe failed to supply affidavits with the motions and that the 911 tape was not newly discovered evidence since it was played for the jury. Additionally, the trial court reasoned that Rowe failed to show that the newly discovered evidence could not have been discovered earlier with due diligence, that it was material, and that it would likely have changed the outcome of the trial.

■ Under RCr 10.02(1), "the court may grant a new trial for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice." Further, the decision to grant a new trial lies within the sound discretion of the trial court, and there must be a showing that this discretion was abused to warrant reversal. *Foley v. Commonwealth*, 55 S.W.3d 809 (Ky.2000). It follows then that the standard of review is whether the trial court abused its discretion in denying the motion for a new trial so that the decision cannot be arbitrary, unreasonable, unfair, or unsupported by legal principles. *Commonwealth v. English*, 993 S.W.2d 941 (Ky.1999). Additional guidance is provided by the precept that a trial court must decide "whether such evidence carries a significance which 'would, with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.'" *Bedingfield v. Commonwealth*, 260 S.W.3d 805, 810 (Ky. 2008) (quoting *Coots v. Commonwealth*, 418 S.W.2d 752, 754 (Ky.1967)).

■ Certainly, for a trial court to grant a new trial based on newly discovered evidence is a seldom-used remedy because, as noted in *Montjoy v. Commonwealth*, 270 Ky. 470, 109 S.W.2d 1209, 1211 (1937), if the "alleged testimony is strictly cumulative ... it is not the policy or the rule, as hereinbefore declared by this court in many cases, to grant new trials for discovered cumulative evidence, unless it be of such a nature and character or so overwhelming, as to render it probable that a different verdict would have been reached." One rationale for the stringent

requirements for a trial to be granted is "based on the [underlying] principle that a defendant is entitled to one fair trial [rather than] a series of trials...." *Foley*, 55 S.W.3d at 814. Therefore, as explained above, a new trial is only available when the "evidence is sufficiently compelling [that it] create[s] a reasonable certainty that the verdict would have been different had the evidence been available at the former trial...." *Id.* at 815. The public policy reason for the zealous use of this post-conviction relief is found in a discussion of "Post–Trial Procedure: Motion for a New Trial":

> It is an understatement to observe that such allegations [newly discovered evidence] are "disfavored" by the courts. The chief reason for distrust is the great temptation to perjury prompted by a desire to strengthen the weak points in the case disclosed during the progress of the trial.

9 Leslie W. Abramson, *Kentucky Practice—Criminal Practice and Procedure* § 32:29 (5th ed.2010–2011).

With these criteria in mind, we assess whether the trial court abused its discretion in denying the motion for a new trial based on the alleged newly discovered evidence. Initially, we examine the proffered evidence, which must be so compelling and of such decisive value that it would, with reasonable certainty, change the verdict or likely change the result of the trial. Here, Rowe's newly discovered evidence is an allegedly enhanced tape of the 911 call made after the shooting.

▪ Before addressing the tape directly, we observe that when making a motion for a new trial based upon newly discovered evidence, the motion should be accompanied by an affidavit illustrating that the evidence could not have been discovered before trial even with the exercise of due diligence. *See Collins v. Commonwealth,*

951 S.W.2d 569, 576 (Ky.1997); *see also Wheeler v. Commonwealth,* 395 S.W.2d 569, 571 (Ky.1965). Here, no affidavits were filed with Rowe's motion or supplemental motions and, therefore, we have no sworn statement by Rowe or his counsel as to the reason the "enhanced" 911 tape is new evidence that, even with due diligence, could not have been obtained during the trial.

Notwithstanding the lack of affidavits, the 911 tape was not newly discovered evidence. This particular 911 tape was presented at the trial, discussed in the direct appeal, and discussed in the federal petition for habeas corpus. In fact, the jury heard the original recording of the 911 call as well as an enhanced recording provided by Rowe's defense.

On direct appeal, Rowe argued that the jury should have been provided with an "enhanced" transcript of the 911 tape. The Kentucky Supreme Court responded that "the jury needed no 'expert listener' to interpret the content of the 911 call. The jurors were capable of resolving for themselves any disputes concerning what was said by whom." *Rowe,* 2007 WL 1532334 at *5. In the petition for habeas corpus, the federal court held that the finding of the state court regarding the transcript would not be disturbed on federal review. Since the 911 tape has already been presented, it is not newly discovered evidence and, hence, does not warrant a new trial.

▪ Now, Rowe asks for another bite of the apple by providing another "enhanced" 911 tape. His only argument is that the trial court's decision to not hold an evidentiary hearing was arbitrary and capricious. But, a defendant is not automatically entitled to a hearing on a motion for a new trial; it is within the trial court's discretion. *Foley,* 55 S.W.3d at 816. Mere spec-

ulation or conjecture, or an observation that technology is changing quickly, do not constitute compelling reasons to warrant either an evidentiary hearing or a new trial under RCr 10.02. It behooves us to recall that Rowe and his counsel provided no affidavits supporting their position.

Finally, we observe that the testimony during the trial as to Rowe's involvement in the criminal action was overwhelming. For example, some of the testimony was as follows: the victim's husband witnessed her shooting and was shot himself after struggling for several minutes with Rowe; the husband also picked him out of a line-up and identified him in court; after the incident, a witness passed Rowe on a road leading away from the shooting; Rowe attempted to sell firearms and a cell phone claiming he needed money to get out of town; and he appeared at his girlfriend's home with blood all over him and his clothes. This testimony is a mere snippet of the evidence presented to the jury at the trial.

To reiterate, "[n]ewly discovered evidence 'must be of such decisive value or force that it would, with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.'" *Collins*, 951 S.W.2d at 576 (quoting *Coots*, 418 S.W.2d at 754). This evidence does not rise to this level, and the trial court did not abuse its discretion in ruling that the "enhanced" audio of the 911 tape was not newly discovered evidence warranting a new trial.

### 2. 2008–CA–001824–MR

With regard to the second appeal in August 2008, Rowe made another RCr 10.02 motion for a new trial based on newly discovered evidence. The motion claims that police tampered with some evidence; that a new witness had come forward who would testify that Rowe was with the witness at the time of the shoot-

ing; and that another expert, after examining the trial record including the 911 tape, had determined that there must have been two shooters involved in the shooting. The trial court denied the motion on September 4, 2008, holding that the action was already on appeal to the Court of Appeals and, therefore, the trial court did not have jurisdiction to rule on the second RCr 10.02 motion.

As with the first motion, Rowe provided no affidavits detailing the newly discovered evidence or the names of the witnesses or any reasons it had not been discovered prior to the trial. As previously detailed, upon motion to consolidate the two appeals, our Court passed on ruling because the trial court's order had no finality language. In response, the trial court amended the order to include the requisite finality language but maintained that Rowe's motion was untimely and that the trial court still did not have jurisdiction. No affidavit was attached to the motion. Any affidavit must detail the new evidence and explain the reasons the evidence was not discovered before trial. And, given the seriousness of the remedy to retry a case that has already been decided, the question remains as to the reason Rowe did not and could not have provided this evidence before. Here, that inquiry extends to questioning the reason that this so-called "newly discovered" evidence was not presented with the initial RCr 10.02 motion, which was made a few months before.

First, we address the timeliness of Rowe's second RCr 10.02 motion. Rowe argues that the trial court did not address timeliness when it originally denied the motion for the new trial. The trial court, however, still had jurisdiction over this order since no finality language attached to its first order and, therefore, it was not

final. So, the timeliness of the motion is at issue. The time to file an RCr 10.02 motion is governed by RCr 10.06(1), which states:

The motion for a new trial shall be served not later than five (5) days after return of the verdict. A motion for a new trial based upon the ground of newly discovered evidence shall be made within one (1) year after the entry of the judgment or at a later time if the court for good cause so permits.

The chronology of the motions herein starts with the final judgment, which was entered on May 8, 2006. Then, on March 29, 2007, Rowe filed the first motion for a new trial based on newly discovered evidence (2008–CA–00916–MR). Because this motion was filed within one year of the final judgment, it met the time requirements of the rule. But the second motion for a new trial (2008–CA–01824–MR) was filed on August 7, 2008, which is outside the one-year time limit of RCr 10.06(1). Hence, the motion was not timely. Moreover, Rowe failed to give any "good cause" for allowing the motion to be filed outside the one-year time limit.

And, RCr 10.06(2) states that:

After a motion for a new trial is filed and if there is an appeal pending, either party may move the appellate court for a stay of the proceedings in the appellate court, whereupon the clerk of the appellate court shall notify the clerk of the trial court that the motion has been filed. The clerk of the trial court shall notify the clerk of the appellate court of the trial court's ruling on the motion for a new trial.

Rowe, however, never complied with the above-cited requirements when he filed his second motion for a new trial. Therefore, we agree with the trial court that not only was the motion not timely filed, but also Rowe did not follow the proper procedural requirements under RCr 10.06 when he filed the second motion. Thus, we hold that the second RCr 10.02 motion was not timely filed.

■ Interestingly, in its order the trial court suggested that, because the Kentucky Supreme Court decision which affirmed Rowe's conviction was entered on May 24, 2007, it tolled the time for filing an RCr 10.02 motion. This premise is not accurate since the pendency of a direct appeal does not toll the time for making a motion for a new trial based on newly discovered evidence. As the plain language of RCr 10.06(1) attests, a party must file such a motion within one year of the entry of the final judgment.

■ Generally, "except with respect to issues of custody and child support in a domestic relations case, the filing of a notice of appeal divests the trial court of jurisdiction to rule on [matters involved in the appeal] while the appeal is pending." *Johnson v. Commonwealth*, 17 S.W.3d 109, 113 (Ky.2000). But, there is authority permitting a trial judge to rule on a motion filed in a criminal case while the case is pending on appeal if the motion raises new issues—such as newly discovered evidence or ineffective assistance of counsel—which could not have been the subject of the direct appeal. RCr 10.06(2); RCr 11.42(1); *Wilson v. Commonwealth*, 761 S.W.2d 182 (Ky.App.1988). Here, it is not necessary to address whether the trial court had such jurisdiction since the motion was both procedurally deficient and untimely.

## CONCLUSION

In the first appeal, the trial court did not abuse its discretion in denying the motion for a new trial based on newly discovered evidence because Rowe did not follow proper procedures in filing the motion, the tape of the 911 call does not meet

the criteria of "newly discovered evidence," and Rowe failed to demonstrate the proffered evidence would have resulted in a different outcome. In the second appeal, the trial court did not err in denying the motion for a new trial based on newly discovered evidence because Rowe failed to follow procedural prerequisites and made the motion outside the time constraints of RCr 10.06.

For the foregoing reasons, the order of the Pike Circuit Court is affirmed.

ALL CONCUR.

